## Case No. 7,466.

JONES et al. v. The HANOVER.
THOMPSON et al. v. JONES et al.
[9 N. Y. Leg. Obs. 232.]
District Court, S. D. New York. 1851.

F. B. Cutting. C. B. Moore, and W. Q. Morton, for the Amelia.

D. Lord, Jr., B. F. & W. S. Butler, for the Hanover.

BETTS, District Judge. These two actions are founded upon a collision at sea. between the schooners Amelia and Hanover. Each party charges the other with being the blameable cause of the disaster. and claims compensation for the damages resulting from it. The two vessels came together in a thick fog, early in the evening of January 18, 1850, a few miles south-easterly from Hog Island. off the eastern coast of Virginia, and about 20 miles from Cape Henry. The Amelia left Hampton Roads for New York at noon the same day. laden with flour. grain, &c. The Hanover was light. on her return voyage from New York to Richmond, with passengers, &c. The pleadings in nei-

ther action state the course of the wind, nor the direction either vessel was taking at the time of the collision; but it appears upon the proofs that the wind was about N. N. W., and that the Amelia was steering nearly N. E. by N., close hauled, and the Hanover heading nearly S. S. W., four or five points off the wind, which would bring them approximating to the same line, running in opposing directions. although it is contended by each party that their vessel was some points to the windward of the other. Had the vessels met in that manner in daylight, or a clear night, they were approaching each other so directly that the familiar law of navigation would apply, and the Hanover. as sailing with the wind. would have been bound to give way, the obligation being imposed on the vessel having the wind free of taking proper measures to get out of the way of a vessel which is close hauled. Story, Bailm. § 611; Ang. Carr. § 651; Abb. Shipp. 234, margin. and notes. If two vessels come together in. thick and foggy weather, when all reasonable precautions have been taken on board of both, the collision is regarded an inevitable accident, and neither is liable to the other for the consequences. The Itinerant, 2 Wm. Rob. Adm. 236. But the law is strict in exacting from each the observance of the greatest care and vigilance under such circumstances, to avoid the danger of collisions.

Various particulars have been adverted to by the courts, as marking the exercise or omission of proper prudence in navigating in thick darkness, mist or fog. These relate to carrying lights, to keeping a sufficient lookout, to the speed of movement, and to notices attempted to be given by fog-horns. bells, or other means tending to indicate the presence and position of the vessel, and afford a warning to others approaching. No positive law has yet settled that sailing vessels are bound to carry lights in the night time. when under way. The point has been frequently before the English court of admiralty. The Rose. 2 W. Rob. Adm. 1; The Iron Duke, Id. 382. The Trinity masters declared their opinion, that under ordinary circumstances. sailing vessels do not show a light, and are not required to do so. Id. 385. But one at anchor. in a track frequented by other vessels. is bound at night to show an efficient light. The Victoria, 3 W. Rob. Adm. 49: Abb. Shipp. 232; Hay v. Le Neve [2 Shaw. App. 395]. The American courts have repeatedly adverted to the subject, without laying down any explicit rule to be regarded as obligatory on vessels under way. The Falcon [Case No. 4.619]. But when at anchor in a harbor (Ang. Carr. §§ 647. 649; The Scioto [Case No. 12,508]; The Indiana [Id. 7.020]; Thain v. The North America [Id. 13.853]), or lights are required by statute to be exhibited (Bulloch v. Lamar. [Id. 2,129]; Waring v. Clark, 5 How. [46 U.

S.] 441) the courts are rigid in exacting an observance of the requirements. So, also, when a vessel is discovered approaching, and apparently not observing the one she advances upon, the latter, on descrying her, if in the night, should exhibit or wave a light, as a warning to her. The Neptune [Case No. 10,120]; The Bay State [Id. 1,148]; The Birkenhead, 3 W. Rob. Adm. 75. These comprise the points considered in the reported American cases. I do not, therefore, think the law imposed on the Amelia the obligation of carrying a light on the occasion, nor is it proved that a custom is established in the coasting trade, in which she was engaged, for vessels in her situation to carry lights. The practice obtains with many masters to do so, yet, the methods they adopt, according to the evidence, vary with the notions of each individual, and a habit of hanging or placing a light somewhere on or above deck, however useful it may prove in particular instances, cannot be regarded as amounting to a custom which sailing vessels must observe, or an usage of such notoriety that vessels at sea will regulate themselves in expectation of its being done by others.

The utility of lights on steamers, usually high out of water, and which hold a steady course, and are not so much encumbered with sails, so that they can give the lights a conspicuous position, is far different from what it may be supposed to be with ships, and particularly small vessels, lying low in the water, which, from the necessity of veering about with the changes of wind, can afford no certain indication by the light, whether their course will interfere with that of the other or not.[1] Accordingly, the vessel approached can have no sure indication of the course of another exhibiting a single light until she is near enough to discover her hull or sails, nor indeed can it be known but that she is at anchor. As the custom is notorious to show a light when a vessel is at anchor, the general bearing of the testimony in this court upon the subject for several years has been, that sailing vessels are more misled than aided by a single stationary light on another sailing vessel under way. A lamp, or brand of fire waved to and fro, is a significant signal that the vessels are closely approximating, and it is a fault to omit giving such signal, when one vessel

has time to do it, or for the other not to heed it when given.

In the present case, I do not think the testimony fixes any blame on the Amelia for not carrying a light, or shows the one on the Hanover was any advantage to her. Was anything omitted on the Amelia after the Hanover's light was descried, proper to be done, or anything wrong done, which tended to produce the collision? These enquiries can only be solved by the testimony furnished from the Amelia, and the consideration of the relative positions of the two vessels, because nothing was known of her on the Hanover until the instant of collision. Kearney, the man on the weather bow of the Amelia, testifies that he was on the look-out. He saw a light right forward, and a little to the windward of the Amelia. He called to the mate at the helm to know if he saw it, and was answered he did not. Then called a second time, and ordered him to port the helm as hard up as he could—gave the order quick, "Up and hard up." As the vessels were striking, he heard an order from the Hanover to put up the helm, but could not tell whether it was given to that vessel or the Amelia. Captain Mott was below, and heard the call of Kearney and a reply by the mate, and went immediately on deck and jumped on the trunk. Then saw a light two or three points on the weather beam of the Amelia. He ordered the wheel hard up—the mate answered, it was hard up. He supposed the light was set on the jib boom of the Hanover; if he had thought it aft, he should have ordered his helm down. The light was then pretty much on his beam. He did not make out the sails of the Hanover, until after he saw the light, and then she was about her length off, as near as he could judge. He heard no hail from the Hanover to his vessel; but some one on the Hanover sung out, "Which way is she going?" He did not understand it addressed to his vessel. Captain Lampkin, of the Hanover, testified he was keeping the look-out on his vessel, and was the first to see the Amelia, then right under his lee bow, the jib boom of the Hanover in the act of passing in between the fore mast and mizzen mast of the Amelia. He could not see more than fifty or sixty feet off on account of the dense fog; and he called out to her to put her helm a-port—that is, up. It is to be remarked, that the Hanover was a large schooner, was light, and high out of water; the Amelia, a small vessel, deeply laden, and lying low in the water. At the time the two masters discovered the proximity of the vessels, it was palpably out of the power of either to do anything which would have prevented the collision. It must have followed instantaneously. Nor does it appear to me any movement of the Amelia could have avoided it, after the light of the Hanover was descried. No reliance can be placed on an estimate of time by witnesses under such circumstances; but the acts which followed

---

[1] "Marine Affairs—Notice to Mariners. The subjoined instructions are forwarded from the U. S. Navy Department: That all U. S. steamers will carry the following lights when at sea during the night. A white light at the masthead; a green light on the starboard paddle-box, and a red light on the port paddle-box. It is believed that the general use of these signals would prevent many disasters. Notice is given that the following steamers are fitted according to the above instructions: [The names of forty steamers on the Atlantic and Pacific Oceans are enumerated in the original instructions.] Wm. Skiddy, Navy Constructor. New York, January, 1851."

demonstrate that the vessels were at the moment directly upon each other. Kearney cried out to the mate, giving notice of the light, and then, as quick as he could, called again to put his helm hard up. Captain Mott heard the cry, and sprang on deck. He was lying on the floor of his cabin, and the outlet was close by the helm, and when he got there the Hanover was only her length from him; and Captain Lampkin says he also cried out to the Amelia to port her helm. It is possible a notice from the Amelia, such as to apprize the Hanover of her situation when the light was first seen by Kearney, might have enabled the latter vessel to luff out of the way of the Amelia; although no great confidence can be placed upon a mere conjecture of the kind, for Kearney says, as does also Captain Lampkin, of the Hanover, that they could not perceive the Amelia obeyed her helm so as to fall off any, and Captain Mott only infers she might have fallen off two or three points; yet a proper precaution ought to have placed at hand some means on the Amelia, by which an effort to warn the Hanover of her position might have been made. A lantern might have been kept within the ready reach of the look-out, which he could have waved on the forward part of his vessel, affording some chance for the other vessel to see it, and be benefited by it. But what would have been far more serviceable, he should have been prepared to give signal by some noise calculated to reach the approaching vessel when she was first descried. These particulars are the only omissions chargeable upon the Amelia, and in my opinion, upon the evidence, from the thickness of the fog and the nature of that darkness, a warning by some appropriate noise would have been the only one which could have benefited the Amelia. If there was a blameable omission in this respect on her part, it attaches equally to the Hanover, and the owner of the latter vessel cannot charge upon the owner of the former the entire loss occasioned by a fault in which both participated alike.

There accordingly seems to me no legal grounds established upon which the action in personam by the owners of the Hanover against the owners of the Amelia can be sustained. At most, the case would only justify a division of the damages between the parties; but as, upon the evidence, the loss fell almost exclusively upon the respondents, a judgment in this form of action could not be rendered in their favor against the libellants, for the excess of damages payable to them after those sustained by the libellants were satisfied, and they would be driven to a cross-action for their remedy. There was no necessity for the suit until a decision was obtained upon the action previously instituted against the Hanover. On the 16th of February, 1850, a libel was filed, and a warrant taken out against the Hanover, and she was arrested thereon the same day. On the 27th of Febru-

ary the libel was filed in personam against the owners of the Amelia, so that the suit in rem was already in prosecution, in which would appropriately be adjusted a division of damages, if one should be decreed by the court because of mutual delinquency, or a fault somewhere, inscrutable in its character. As the owners of the Hanover fail to establish a right to recover against the owners of the Amelia, independent of a counter responsibility to the latter, and that liability, if regarded only as a right of set-off, will greatly overbalance the demand of the libellants, the libel in personam must be dismissed with costs. It may be proper to notice, that an act of congress, passed the present session, limits the liability of owners of vessels for damages by collision to the value of their interest in the vessel and freight at the time the wrong was committed. 9 Stat. 635, § 3. Under similar provisions of a British statute, the court of admiralty in England holds that, in case of the total loss of the colliding vessel in consequence of the collision, no action can be maintained against the owners for damages. The Seringapatam, 3 W. Rob. Adm. 41. This is founded upon an alleged exposition of the statute by the court of exchequer, but the case is not quoted.

Without professing myself satisfied with the principle adopted by the English courts, I think here the clear equity is with the respondents, and the decree must be in their favor for costs. The two cases have been submitted to the decision of the court upon the same proofs and arguments. The decision in one case in effect must determine the controlling points in the other; yet the suit in rem against the Hanover brings more directly under consideration all the particulars of the occurence, and properly requires a more minute examination of the movements of the two vessels than has been given in the personal action. It is assumed in that decision that the two vessels were moving in opposite directions on the same line. That seems to be the reasonable bearing of the evidence taken together, although no positive exactness can be attained on this particular. The course of the wind, and the courses the two vessels were steering, are given upon estimates, neither being ascertained by the compass. The wind was about N. N. W. The Hanover was bearing about S. S. W., and the Amelia about N. E. by N., the sails of each vessel being kept full, the Amelia close hauled about five points on the wind, and the Hanover four or five points free. The testimony does not enable the court to fix these positions with certainty, yet the variations of a point or two either way from these precise courses, would still leave the vessels so directly approaching that, in the day time, the Amelia would have the privilege of holding her course, and the Hanover would be bound to give way. Westminister Review, Sept. 1844, p. 63. 3 Kent, Comm. (6th Ed.) 230; Abb. Shipp. 234. It is otherwise

when the wind is equally favorable to each, for then both must go off to the right (Ang. Carr. § 652; Story, Bailm. § 611), and if it be doubtful as to that, or of the precise course of the approaching vessel, the one on the larboard tack, particularly in the night, must give way in due time (Ang. Carr. § 654), without regard to the fact that she may be a point or two most to the windward (The Traveller, 2 W. Rob. Adm. 197; The Ann and Mary, Id. 195). The Amelia, in the darkness of the night, and the glimmering of light apparently directly ahead, was justified in acting upon the supposition that the vessels were so situated in relation to each other that it was the duty of both to give way, so as to pass to larboard. But she was very likely mistaken in the supposition, as from the manner the blow was given it is most probable the Hanover was, in fact, rather to leeward instead of in a right line with, or to the windward of, the Amelia. Several circumstances tend to prove this. First. The light which was seen dead ahead was on the starboard side of the Hanover, and aft of midships. Had the Amelia been to the leeward, the sails of the Hanover would have interfered with, if not intercepted, a direct view of the light, or brought it to bear off her larboard bow. In the second place, it is reasonable to infer that the action of the Amelia's helm, when put hard down, had some effect upon her, she being under good headway, with a strong breeze, and that she had, as conjectured by her master, fallen off some points by her head, and perhaps sufficiently to move her out of the track of the Hanover, had the latter been, when descried, dead ahead. And, in the third place, the blow was given so far aft on the Amelia as to indicate that she was then standing more at right angles with the direction of the Hanover than she would naturally be had the latter been directly ahead, and is not readily reconcilable with the notion the Amelia was to windward. These presumptions, however, if well founded, in no degree vary the relative rights and duties of the two vessels. The movement of the Amelia was in thick darkness and at random, to rescue herself from a danger impending instantly over her; and whether, in the extremity, she went to the right or left, could not be imputed as a fault to her. To render her chargeable for a wrong movement thus made, there must have been some delinquency on her part in the circumstances bringing her into that situation. Nor, indeed, do these hypotheses supply any conclusion very satisfactory to the judgment, for any inadvertent bearing up of the Hanover when there was no special effort to hold her to a fixed line, or any accidental irregularity in her steerage, might fully account for her being in a situation to give such a blow as received by the Amelia, whether when first described she had been running on the same line with her, or a point or two to leeward or windward; and it is to be remarked, there is no proof that there was any particular effort to keep her steady to a fixed course by the compass. Both vessels were guilty of two marked faults, but neither more so than the other. It was the duty of both to have had on deck all the disposable part of their crews to aid in keeping a watch during the continuance of the dense fog. This fog had come on suddenly, and it was well understood by those familiar with the navigation, and climate in that region, that, under the existing state of the wind, the obscurity would be but temporary. In fact, it was removed within a few minutes after the collision and before the vessels could be separated. Admitting that a careful look-out was kept by one man on each vessel, it was inadequate, and not what the exigencies of the case demanded.

This point is frequently brought up in the decisions of the English admiralty, and it seems to be insisted on as want of vigilance. if not a mark of positive fault, to trust the watch, under such circumstances, to a single look-out. In one of the latest cases, it was observed by the court, when the master went below to examine his chart, leaving a single man on the look-out, that it is no excuse to urge that from the intensity of the darkness, no vigilance, however great, could have enabled one vessel to descry the other in time to avoid the collision. In proportion to the greatness of the necessity, the greater ought to have been the care and vigilance employed, and if the master found it necessary to go below, he was bound to have called up another of the crew to supply his place on deck. The Mellona, 3 W. Rob. Adm. 7. Similar doctrine is declared in other cases. 2 W. Rob. Adm. 201, 206, 234. The precaution, incumbent on both vessels to use in such extremity of weather, was alike omitted by each, that of giving notice of their situation by sounding fog horns, ringing bells, or employing other signals of like efficacy. Dr. Lushington has in repeated instances marked this as a duty of the most urgent character, with vessels embedded in deep fogs, or mist, or thick darkness. The Itinerant, 2 W. Rob. Adm. 237; The Virgil, Id. 201; The Ebenezer, Id. 206; The Europa (1850) 14 Jur. 627. The practice has been likewise recognized in this court, as one demanding the observance of vessels so situated. The Bay State [Case No. 1,148]. Both vessels were guilty of a common fault in these two particulars, which, if the libellants have not shown misconduct and negligence on the part of the Hanover in other respects conducing to the disaster, will call for the decree apportioning the loss between them, because one vessel, by her own improvident or improper conduct, placing herself in a situation to receive damages from another acting with like improvidence and impropriety, but without any culpable purpose, cannot impose on the latter the entire loss incurred. Story, Bailm. §§ 608. 610. It is different at

law, as a party cannot then, when himself in whole or in part the blameable cause of the injury he has sustained, claim compensation for the injury his own fault has tended to produce. Kent v. Elstob, 3 East, 18; 3 Kent, Comm. 231, note 6.

It is charged against the Hanover, that she was running under too heavy a press of sail, and at a dangerous speed, and that at the time the two vessels came within sight of each other she had no look-out stationed forward. The Hanover was in ballast, and had her main-sail, foresail, main-top-sail, jib and flying-jib all set. She had a beam or leading wind, steady at about N. W. This is so stated by Capt. Lampkin. Capt. Mott, of the Amelia, makes the wind N. N. W. She was making 7½ to 8 knots the hour. The Amelia had no square sale, but was running close hauled with all her sails set, and making about 6 knots the hour. The sea was pretty rough. The speed of the vessels is of course given upon conjecture, but supposing the estimates approximate the actual speed, the difference is too small between them to render the act of maintaining it essentially more culpable in one than the other. The doctrine of reason as well as of the law, in regard to vessels running in intense darkness is, that those of all descriptions should so check or restrain their velocity that their movements may be reasonably under command of their crews, and so that the effect of a collision, if one occurs, may be prevented becoming fatal to either. The Iron Duke, 2 W. Rob. Adm. 377; The Rose, Id. 1; The Europa, 14 Jur. 627; The Bay State [supra]; The Neptune [Case No. 10,120]. The Virgil was condemned in damages and costs for running down another vessel because going before the wind in a hazy, dark night at the rate of eight or nine knots the hour. The Trinity masters reported she was faulty in not being put under easier sail. 2 W. Rob. Adm. 201. In the succeeding case of The Ebenezer, the same court, however, held it not to be ground for condemnation, that she was running in thick weather and a dark night with full sail, when no other circumstance of fault was found against her, and it might be reasonable precaution against vessels following her to keep on all sail. Id. 206.

I am not disposed to pronounce the Hanover guilty of any negligence or want of precaution in this respect, on the occasion, seeing she was as liable to be followed by vessels on the same course as to meet those going in an opposite direction, and that, probably, both vessels, with a view to these considerations, were going at nearly an equal rate of speed. Nor do I think either vessel was bound to come to anchor, although on soundings, because both were, in effect, on the high seas, and it is proved by Capt. Dearborn that anchoring at that place, in the state of the weather, would be highly hazardous. Nor does it appear to me that the

cause turns upon the question of proper or improper speed of the vessels at the time, or that the extreme darkness imposed more responsibility on one than the other. The Birkenhead, 3 W. Rob. Adm. 75. It is attempted to be shown against the Hanover, by a critical analysis of the proofs and the attendant circumstances, that there was not, at the time when she was descried by the Amelia, (and the collision became inevitable,) any look-out stationed forward upon her. Captain Lampkin swears positively to the fact that he had himself the station of look-out forward, and so placed himself that, as far as his vision could extend, he had a view off each bow of his vessel, and that he was at that post, keeping a careful look-out, twenty or thirty minutes previous to the collision. He did not see the Amelia until the bowsprit of the Hanover passed over her side. It is argued with great earnestness that he had neglected his duty of look-out in going aft to examine the soundings of the lead, and that the depositions of Waldin, the man at the helm, and of Wilson, the one heaving the lead, import that the master was about the deck elsewhere than forward keeping a look-out at the moment the Amelia was descried.

On a most careful consideration of all that evidence, I do not find anything in it in contradiction to, or necessarily inconsistent with, the statement of Captain Lampkin. Nor is he any other way contradicted in this respect than by the seeming improbability, that keeping a careful watch he could run upon the Amelia, without seeing her until within the length of his bowsprit from her hull. Whether he was capable of seeing her or not must depend upon the denseness of the mist and fog. It may present a reason for greater caution in examining and receiving the representations of Captain Lampkin as strictly true, that the body of the Hanover was seen from the Amelia at a greater distance than that. Still, it must be borne in mind, that the Hanover was much the larger vessel, stood higher out of the water, and presented a broader view of her sails to the Amelia, if they approached in a direct line; and, also, that the attention of those on board the Amelia was fixed upon the point where she appeared by the light previously discerned in that direction. I cannot, therefore, regard those circumstances as discrediting the testimony of Captain Lampkin, and whilst I pronounce both vessels grossly culpable in running in such thick darkness in a route known to be a great thoroughfare for coasters, with only a single look-out stationed forward, I must hold the blame incurred by them alike, and can see no reason for charging upon the Hanover the whole responsibility for the neglect. It is impossible to assert, that if both crews had been employed in keeping the most vigilant watch, the approach of the two vessels could have been discovered sooner than they were in fact.

Nevertheless the law imposes on them the necessity of using the utmost precaution adapted to the nature of the hazard and within their ability to employ. That of maintaining a full and attentive look-out is always signalized as one most urgent, and generally found to be most beneficial. 2 W. Rob. Adm. 201, 206, 234; 3 W. Rob. Adm. 7, 17; The Falcon [Case No. 4,619].

I do not, on a careful view of all the evidence, regard the collision as an unavoidable accident, in which neither vessel should be answerable to the other for the consequences. 2 Hagg. Adm. 154. On the contrary, I think the case is resolved into one of mutual neglect and inattention in these vessels, and that the losses they have incurred in consequence, must be apportioned between them. This rule of dividing a common loss between the parties occasioning it, or "judicum rusticum," as sometimes termed, is peculiar to this class of cases, and obtains only in maritime courts. Chancellor Kent regards it one of equity and expediency, when both parties are to blame, and where the controlling fault cannot be detected. 3 Kent, Comm. 231. After the collision had occurred, it was the duty of all on board both vessels to do everything within their power to rescue each other from the calamity, and lessen to the greatest extent possible the injurious consequences, and neither is responsible to the other for losses which might, by reasonable exertions, have been avoided or diminished by those sustaining them. It is imputed to the master of the Amelia that he abandoned his vessel without justifiable cause, and without any of the efforts a prudent and resolute man would have made to save her. The testimony of the captain of the Hanover is very pointed and strong to that effect. His representations are to be received with great caution in this respect, for, whatever may be his integrity of character, there must be an influence creating the strongest bias on his mind, to exhibit his own conduct in a proper light, and cast on the suffering vessel and her crew the burthen of blame, if any, leading to the catastrophe. He accordingly charges on Captain Mott gross inattention to and neglect of his vessel, when proper efforts, within his means to employ, might have saved her. Immediately after the concussion, Captain Mott and his two men jumped on board the Hanover. They stepped back twice to the Amelia whilst the vessels continued fastened together, remaining but a minute or two, and making no effort to save their own effects. All they did was to attempt to lower their own boat, to have it in readiness, and to extricate the vessels from each other, first by lowering and then immediately hoisting some of the forward sails of the Amelia. One of the davits upon which her boat hung was carried away by the Hanover, thus letting down one end of the boat into the water, causing it to fill immediately, and rendering it useless for the service of the crew. Captain Lampkin says he directed Captain Mott to anchor his vessel, and offered his boat for his use, and also two of his own crew to go on board the Amelia, and two of the men testify they offered and were willing to go in her. These statements must be received with some allowance, if not distrust. Captain Mott denies he had any directions or advice from Capt. Lampkin to anchor the Amelia, and the inquiry will naturally arise, why, if Captain Lampkin did not think her seriously injured, he should require her to be anchored more than the Hanover? It would not be a very obvious or promising measure to take in the predicament of the vessels. The wind and sea were high, the night very dark, and as yet it was unascertained what might be the character and extent of the injury either vessel had received. Captain Dearborn proves that the place was an open roadstead and unsafe for the anchorage of small vessels. It is scarcely credible, therefore, that while the vessels were thumping violently together, and the danger to both becoming instantly more imminent, that any advice should have been given to bring the Amelia to anchor, with a view to her safety. The probability is also strongly against any offer then being made to lend the boat of the Hanover to the Amelia, or to place part of her crew on board the latter. Captain Lampkin, in answer to enquiries why he did not see to having the anchor of the Amelia thrown over, if he deemed it so important, excuses any personal attention to the matter, because his anxiety and exertions were all required by his own vessel, as he felt it of extreme necessity to clear her immediately of her then situation. What use, besides, for her boat, whilst the two vessels remained entangled and beating violently together, and why would it be offered the Amelia in that situation? The acts on board the Hanover show that all the efforts of the crew were called forth for her rescue and preservation. The main stays or shrouds of the Amelia were cut away by the crew of the Hanover, and it was manifestly considered everything respecting her must be disregarded or sacrificed to aid in saving the Hanover. After the vessels separated, there would seem to be no object in offering the boat of the Hanover, or men from her, because the Amelia filled off instantly with her sails on the wind, and was out of sight in a few minutes. No fact is in evidence to show she could have been successfully pursued and overtaken, had the boat of the Hanover been despatched for the purpose, nor is it proved that any body on board the latter believed it could have been done. If, then, an offer, such as is stated, was made, all the facts conduce to show it was after the vessels had separated, and when no serviceable end could be expected to be answered by it.

In my opinion, the circumstances well justified the master and crew of the Amelia abandoning her, and seeking the preservation of their lives in the Hanover. The shock of the two vessels in striking had knocked the mate of the Amelia overboard, and he was drowned. The wound received by her was near mid-ship. The slight examination made indicated it to be a fatal one, both from its place and extent. She was a small craft, deeply laden, lying low in the water. The Hanover was driving stem on her, by force of the wind and sea, and each moment perilling her instant destruction. When cast loose, her main shrouds were severed. The night was dark, the sea rough, and no port she could hope to make with security short of twenty miles distance. For the master and two men, or even four, to have attempted her navigation under these circumstances, would have been flagrant rashness, particularly without a boat in which they might have a chance for their lives. It is not to be inferred or credited that the Hanover, until her own condition was fully known, would have allowed the Amelia to take away her boat, leaving no means of escape, if one became necessary, for her own crew and the twelve passengers she had on board. The propriety of the course adopted by the captain of the Amelia is not to be determined by the aspect of things as now presented to us, nor by the impressions of Captain Lampkin at the time, but according to the natural language of the circumstances then in view of Captain Mott. He was bound to devote himself with energy and courage to the preservation of his ship, but there was no obligation on him to peril his own, and the lives of his crew, in an undertaking desperate, or imminently perilous in its character, when other means of safety were at hand, and he ought not to be controlled in his decision, nor its justness be measured, by the opinion of those whose interests were all on the side of his encountering the hazard.

By the testimony of Captain Mott and Kearney, who examined the break made in the side of the Amelia, as far as the condition of things at the moment permitted, there was probable reason to believe she would sink instantly on being disengaged from the Hanover. It is to be accepted on the evidence, that she perished from that cause, although she was seen under way fifteen minutes after she was cut clear from the Hanover. She was shortly afterwards fallen in with, capsized and mostly under water, and soon afterwards was seen stranded on the coast, near Norfolk; it would, therefore, be easy for the claimants, who reside there or at Richmond, to prove the state of her bottom, and show that no such injury had been inflicted there as must necessarily have caused her destruction. In my judgment, the master and crew were justified in abandoning her, and her total loss must be attributed to the injury received from the collision with the Hanover.

Many particulars in the extended detail of proofs have been urged by counsel with much earnestness as tending to discredit Captain Mott and Kearney on one side and Captain Lampkin on the other. I do not discuss those topics, or pronounce any opinion on the bearing or effect of those particulars, because, to my mind, the essential facts upon which the decision is rendered stand unquestioned before the court. I shall, accordingly, order a reference to ascertain the total loss sustained by each vessel, and that there be decreed an equal apportionment of the whole losses between them. The libellants sue as owners of the schooner, her equipments and freight, and claim recompense for a total loss of those, and also claim the right, as bailees of the cargo, to recover the value of the cargo in behalf of all persons interested in it who shall contribute to the expenses of this suit. There are no papers presented on the hearing to show that the owners of the cargo have made themselves parties to this action so as to be concluded by its decision. If they do not connect themselves properly with the cause, so as to have their rights determined with it, their interests will not be taken into account on the reference before the commissioner. Order accordingly.